## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 17-cv-81162-BLOOM/Reinhart

JUAN TORRES and
ALEJANDRO TORRES,

      Plaintiffs,

v.

FIRST TRANSIT, INC.,

      Defendant.

_____/

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** is before the Court upon Defendant First Transit, Inc.'s ("Defendant") Motion for New Trial and Remittitur. ECF No. [137] ("Motion"). Plaintiffs Juan Torres and Alejandro Torres (collectively, "Plaintiffs") filed a Response in Opposition, ECF No. [148] ("Response"), to which Defendant filed a Reply, ECF No. [152] ("Reply"). The Court also allowed Plaintiffs to submit a Sur-reply, ECF No. [154] ("Sur-reply"), to address the exhibits that Defendant filed on Reply.

Consistent with the instructions from the Court of Appeals for the Eleventh Circuit, this Court held an evidentiary hearing on the Motion on February 19, 2021. *See* ECF No. [212]; *see also Torres v. First Transit, Inc.*, 979 F.3d 876, 887-88 (11th Cir. 2020). The parties also submitted proposed findings of fact and conclusions of law. *See* ECF No. [209] (Plaintiffs' Proposed Findings of Fact and Conclusions of Law); ECF Nos. [210], [213] (Defendant's Proposed Findings of Fact and Conclusions of Law). The Court has carefully reviewed the Motion, all opposing and supporting submissions, the evidence and testimony presented during the evidentiary hearing, the

record in this case, the applicable law, and is otherwise fully advised. Accordingly, the Court makes the following findings of fact and conclusions of law.

## I.   BACKGROUND & PROCEDURAL HISTORY

This case arises from an automobile accident that occurred on September 30, 2017. The Plaintiffs' vehicle was struck by a bus driven by Defendant's employee, causing significant injuries to each Plaintiff. The Defendant admitted liability and the case proceeded to trial on the issue of damages. On November 8, 2018, following a three-day jury trial, *see* ECF Nos. [124], [125], & [129], the jury returned verdicts in favor of each Plaintiff, *see* ECF No. [109]. As to Alejandro Torres, the jury awarded damages in the amount of $2,496,261.13, which included past medical expenses ($396,261.13), past pain and suffering ($600,000.00), and future pain and suffering ($1,500,000.00). ECF No. [109] at 1. As to Juan Torres, the jury awarded damages in the amount of $4,927,604.38, which included past medical expenses ($877,604.38), past pain and suffering ($1,050,000.00), and future pain and suffering ($3,000,000.00). *Id.* at 2. On November 13, 2018, the Court entered Final Judgement in Plaintiffs' favor. ECF No. [110].

### A.   Post-Trial Motion

On December 11, 2018, Defendant filed the instant Motion requesting a new trial "based on its post-trial discovery of the litigation histories of two trial jurors, identified as Y.C. and E.S., which were not disclosed during the jury selection process." *Torres*, 979 F.3d at 879.[1] The Eleventh Circuit summarized the issues raised in the Motion as follows:

> First Transit discovered that Juror Y.C. had been a defendant in eight civil litigation matters, and Juror E.S. had been involved in five civil litigation matters.[n.2] Y.C.'s

---

[1] Defendant also sought a new trial or remittitur because the jury's award was excessive and against the greater weight of the evidence, *see* ECF No. [137] at 6-12, which the Court previously denied, *see* ECF No. [155] at 9-12. However, these excessive-verdict arguments are not at issue on remand from the Eleventh Circuit. *See Torres*, 979 F.3d at 881 n.4 ("Because we are remanding this case to the District Court for an evidentiary hearing to determine whether the jury was impartial in reaching its verdict and to decide whether a new trial is warranted on that ground, we do not reach First Transit's excessive-verdict arguments.").

litigation history includes multiple suits to collect unpaid credit card debt, two foreclosure actions on property for which she was a mortgagor, and a lawsuit of undisclosed nature brought against her by the state of Florida. E.S.'s litigation history includes two foreclosure actions brought by a condominium association for his failure to pay assessments, costs, and fees associated with his unit, as well as several suits brought against him to collect unpaid debts.

> [n.2] Though the District Court suggested that E.S.'s litigation history included a sixth matter, a personal bankruptcy, the evidence provided by First Transit does not appear to include any bankruptcy filings.

The jurors in this case completed two forms prior to trial. The first, a "juror qualification form," is part of the District Court's juror selection plan and was mailed to prospective jurors alongside their jury summons to help the District Court determine the prospective jurors' eligibility to serve. United States District Court for the Southern District of Florida, *Plan For The Random Selection Of Grand And Petit Jurors* (May 5, 2010), available at https://www.flsd.uscourts.gov/sites/flsd/files/JuryPlan.pdf. All prospective jurors were required to complete this questionnaire and return it to the clerk of court. *See id.* at Section VII, "Drawing of Names from the Master Jury Wheel; Completion of Juror Summons and Questionnaire Form" (incorporating 28 U.S.C. § 1864(a)).

Once the venire was summoned pursuant to the District Court's juror selection plan, the prospective jurors assigned to District Judge Bloom's court completed a second form, Judge Bloom's "Juror Questionnaire in Civil Cases" (the "juror questionnaire") . . . . Generally speaking, the juror questionnaire covers subjects like the prospective jurors' education, employment, and hobbies, as well as the prospective jurors' previous experiences in lawsuits and with juries. *Id.* The prospective jurors were not aware of the subject matter of this case at the time they responded to the juror questionnaire, and the questionnaire was completed prior to the commencement of *voir dire*. Indeed, the District Court acknowledged before *voir dire* began that the parties' need for background questioning of the jurors was obviated by the fact that their counsel "ha[d] the benefit of the completed [juror] questionnaires."[n.3]

> [n.3] Although the juror questionnaire was completed prior to *voir dire*, a prospective juror's answers to the questionnaire are treated as equivalent to answers on *voir dire*. *See, e.g.*, *United States v. North*, 910 F.2d 843, 903-04 (D.C. Cir.) (juror's concealment of brothers' prior criminal convictions on questionnaire treated as "juror withhold[ing] critical information on *voir dire*"), *opinion withdrawn and superseded in part on other grounds*, 920 F.2d 940 (D.C. Cir. 1990).

First Transit's motion for a new trial focused on Y.C.'s and E.S.'s responses to a question on the juror questionnaire and to a question posed on *voir dire*. On

question 10 of the juror questionnaire, prospective jurors were asked: "If you and/or a close family member or friend has ever been a party to a lawsuit (i.e., sued someone or been sued by someone) please describe the circumstances." Despite their litigation histories, Y.C. answered "N/A," and E.S. answered "No." Similarly, during *voir dire*, the prospective jurors were asked by the Court: "Is there anyone that has been involved in a civil lawsuit that has shaped your view either negatively or positively about the legal system that you believe would have an effect on your ability to serve as a fair and impartial juror?" Again, neither Juror Y.C. nor Juror E.S. responded affirmatively.

First Transit contends that both jurors' failure to disclose their litigation histories in response to these questions was, in both cases, an "affirmative concealment" suggesting a lack of impartiality. Accordingly, First Transit argues that it is entitled to a new trial—or, at least, an evidentiary hearing to determine unresolved questions of fact necessary to decide whether Y.C. and E.S. were challengeable for cause.

*Id.* at 879-80 (some citations omitted).

Plaintiffs opposed the Motion, arguing that Defendant had waived the right to challenge the jurors' nondisclosure post-verdict when, through the exercise of reasonable diligence, Defendant could have uncovered the jurors' publicly available litigation history before the jury returned its verdict. Additionally, Plaintiffs asserted that Defendant was not entitled to a new trial because there was no evidence of the jurors' dishonesty or their actual bias.

On February 13, 2019, this Court denied Defendant's Motion without holding an evidentiary hearing and explained that, even assuming that the jurors were dishonest on the questionnaire and during *voir dire*, there was no indication of actual bias or of any close connection between the facts of this case and the jurors' prior undisclosed litigation. *See Torres v. First Transit, Inc.*, 367 F. Supp. 3d 1373, 1378 (S.D. Fla. 2019), ECF No. [155] ("Order"). Because it concluded that the jurors were willing and able to be fair and impartial in this case and that Defendant had failed to show the existence of any actual bias, the Court declined to consider whether Defendant had waived its right to challenge the jurors' alleged nondisclosure by waiting to conduct an investigation into the jurors on the panel until it received the unfavorable verdict. *See id.* at 1379 n.4.

### B.  Appeal to the Eleventh Circuit

Defendant appealed the Court's Order. On review, the Eleventh Circuit vacated the Order

and remanded the case back to this Court for an evidentiary hearing on whether Jurors Y.C. and

E.S. could have fairly and impartially considered the evidence presented at trial and applied the

law in accordance with this Court's instructions. *See Torres*, 979 F.3d at 887-88. The Eleventh

Circuit instructed that:

> [t]he evidentiary hearing should include in-depth questioning of both Juror Y.C.
> and Juror E.S. about the prior litigation in which each was involved. At a minimum,
> the questioning should cover the facts of those prior cases; the identities of the
> lawyers, parties, and judges; the jurors' perceptions of the prior cases and of the
> legal system as a whole; and the outcomes of the prior cases—that is, whether the
> jurors prevailed or lost. The Court will need to determine whether the jurors harbor
> any biases—including those against the legal system itself—that would cast doubt
> on their fundamental ability to properly weigh the evidence and would ultimately
> render them partial. We expect that the result of the District Court's hearing on
> remand will be a full elucidation of these factual issues.

*Id.* at 888.

### C.  Proceedings on Remand

On remand, the Court appointed counsel for the jurors at Plaintiffs' request, *see* ECF No.

[177], and scheduled a status conference to discuss the procedures that would apply during the

evidentiary hearing, *see* ECF No. [173]. At the status conference on January 12, 2021, Defendant

indicated that, following remand from the Eleventh Circuit, it had expanded its original

investigations into the jurors and stated that it intended to address additional legal proceedings

beyond those initially uncovered post-trial. ECF No. [184] at 10-14. The Court, however,

explained that the evidentiary hearing would be limited to those matters initially raised in

Defendants' Motion, and ordered that all supplemental evidence be filed on the docket by January

29, 2021. *Id.* at 13-14.

Upon receipt of this additional evidence, the Court held another status conference on

February 12, 2021, to address the relevance of the documents that were submitted. ECF No. [200]. The Court made it explicitly clear at this second status conference that no legal proceedings were to be addressed at the evidentiary hearing if they were not originally identified in Defendant's Motion in December 2018. *Id.* at 10-15.

Nevertheless, on February 16, 2021, Defendant filed a Renewed Request to Question Juror E.S. Regarding Undisclosed Prior Felony Conviction. ECF No. [196] ("Renewed Request"). On February 17, 2021, this Renewed Request was denied for the reasons the Court previously stated on the record at the second status conference. ECF No. [202].

### D. Evidentiary Hearing

On February 19, 2021, the Court held a seven-hour long evidentiary hearing on Defendant's Motion to determine whether Jurors Y.C. and E.S. made dishonest statements during *voir dire*, where their otherwise truthful responses would have provided Defendant with valid bases to strike them for cause. *See* ECF No. [212]. This proceeding was attended by counsel for each party, Jurors Y.C. and E.S., and appointed counsel for Y.C. and E.S. and it addressed the jurors' prior litigation history[2] and the impact of these prior lawsuits on the jurors' ability to be fair and impartial in this case. Based on the jurors' testimony and the documentary evidence presented by Defendant, the Court makes the following findings of fact and conclusions of law.

### II. FINDINGS OF FACT

As noted above, on February 19, 2021, the Court held an evidentiary hearing, where Y.C.

---

[2] Consistent with its rulings at the second status conference and on Defendant's Renewed Request, prior to commencing the evidentiary hearing, the Court once again denied Defendant's renewed *ore tenus* motion seeking permission to: (1) question Juror E.S. about whether he had previously been convicted of a felony, although this conviction was not originally raised in the Motion, *see* ECF No. [212] at 6-12, 107-08, and (2) question Juror Y.C. regarding legal proceedings that arose after her selection as a juror in this case, *see id.* at 74-75. *See also* ECF No. [210-1] (Defendant's Proffer Regarding Juror E.S.); ECF No. [210-2] (Defendant's Proffer Regarding Juror Y.C.). The Court reiterated that the scope of questioning permitted at the evidentiary hearing was limited to the matters that were originally raised in Defendant's Motion.

and E.S. were subjected to in-depth questioning about the nature and extent of their prior lawsuits, the facts and outcomes of these prior cases, their perceptions of these cases and of the legal system as a whole, their ability to remain fair and impartial, and the truthfulness of their answers to the questions posed during jury selection. *See id.* Their testimony is set forth below.

### A. Juror Y.C.

The Court started off the evidentiary hearing by thoroughly questioning Juror Y.C. on certain "core" topics, including the truthfulness of her answers to question 10 of the juror questionnaire and during *voir dire*, her understanding of the questions posed and their meaning, her motives for nondisclosure, her perception of the legal system as a whole, and her ability to be fair and impartial to all parties.

Defendant, however, argues that Y.C. could not have been fair or impartial in serving as a juror here, especially given the nature and extent of her prior litigation history. Indeed, Defendant contends that Juror Y.C.'s involvement in seven prior lawsuits is clear evidence that she gave intentionally dishonest answers on the juror questionnaire and during *voir dire*. Likewise, Defendant asserts that Y.C.'s bias must be presumed because her prior litigation history relates entirely to debt collection and foreclosure proceedings, and this case could have potentially resulted in debt collection proceedings against Plaintiffs on their unpaid medical bills. The Court will first detail Y.C.'s testimony in response to the core questions posed by the Court and counsel before turning to each of her seven prior lawsuits.

### 1. Core Questions

During the Court's initial inquiry, Y.C. testified that she answered all of the questions on the juror questionnaire to the best of her ability and that her answers were truthful. ECF No. [212]

at 18-19. In particular, Y.C. stated that her answers to questions 10 and 12[3] were truthful at the time she completed the form. *Id.* at 19. Likewise, during *voir dire*, the Court asked "Is there anyone that has been involved in a civil lawsuit that has shaped your view either negatively or positively about the legal system that you believe would have an effect on your ability to serve as a fair and impartial juror? If so, please raise your hand." ECF No. [124] at 34. No hands were raised. *See id.* At the evidentiary hearing, the Court restated the question it asked during *voir dire* and Juror Y.C. affirmed that her silence in response to this question was truthful, explaining that, "At the time, I didn't know I had been involved in a lawsuit." ECF No. [212] at 20.

Y.C. went on to state that she had since learned, in the month before the evidentiary hearing, that she had, in fact, been a party to lawsuits. *Id.* at 21. Indeed, she testified that her court-appointed attorney in these proceedings informed her that "all claims in a court are lawsuits," and she noted that she had "been involved in some cases that [she] did not believe [] were lawsuits." *Id.* at 21-22. Juror Y.C. clarified her confusion regarding whether certain cases were "lawsuits," stating: "I thought lawsuits were only cases where—where people were seeking compensation for pain and suffering, and—like in a car accident or an accident at work, someone getting hurt. And the cases I have been involved with are collection cases, a divorce. To me, those were not lawsuits." *Id.* at 22. Nevertheless, Y.C. had no hesitation or doubt that her experiences during these collection cases had no effect on her ability to serve as a fair and impartial juror in this case. *Id.* Juror Y.C. further expressed that she had no intention to conceal the information regarding her prior litigation history during jury selection. *Id.* at 22-23. Rather, she answered all the questions

---

[3] Question 10 asked, "If you and/or a close family member or friend has ever been a party to a lawsuit (i.e., sued someone or been sued by someone) please describe the circumstances." Juror Y.C.'s answer to this question was "N/A." *See* ECF No. [141-1]. Moreover, question 12 asked, "Is there anything in your background or personal feelings which might affect your ability to be fair and impartial to both sides?" Juror Y.C. responded "no." *See id.*

truthfully based on her mistaken understanding that she had never been involved in a lawsuit because "a lawsuit involved someone getting hurt." *Id.*

The Court permitted the attorneys to ask questions to Juror Y.C. directly. During the Defendant's examination, Y.C. acknowledged that she was aware, during jury selection, of the possibility that a collections issue could arise regarding Plaintiffs' medical bills in this case, but she emphasized her understanding that this case was not a collections case. *Id.* at 34. Moreover, when asked whether her prior litigation history had negatively affected her life or her views of the legal system and/or its fairness, Juror Y.C. said that it had not. *See, e.g.*, *id.* at 70, 78, 81 ("I don't have any problems with the legal system."). Rather, Juror Y.C. agreed that she owed all of the debts at issue in her prior lawsuits. *Id.* at 81. With regard to her failure to disclose her prior collections actions during jury selection, Y.C. stated, "I accept I made a mistake when I filled out the form. It wasn't intentional. I didn't know at the time that I had been involved in lawsuits." *Id.* at 90. She also expressed that there was nothing in her background or personal feelings, including those relating to her prior cases, that would affect her ability to be fair and impartial. *Id.* at 95. Juror Y.C. testified that she felt no bias toward any party based on her prior litigation history, that she did not feel that the issue in this case regarding outstanding medical bills was comparable to any of her previous collections cases, and that disclosing her litigation history would not have affected her ability to serve as a fair and impartial juror here. *Id.* at 98.

### 2. 2003 Lawsuit

Defendant first questioned Juror Y.C. about her knowledge of and involvement in a lawsuit filed on May 21, 2003, by the State of Florida's Department of Financial Services against Y.C. and her stepfather. *See* ECF No. [212] at 44-45 ("2003 Lawsuit"). This action was ultimately dismissed without prejudice for lack of prosecution on June 10, 2004. *See* ECF No. [188-1] at 47.

The state court docket reflects that this action involved issues of contract and indebtedness (up to $5,000.00), but there is no other evidence in the record that indicates the precise nature of this case. *See id.* at 44-45. Juror Y.C. testified that she had no knowledge or recollection of this case, and that she did not know whether her stepfather had ever been served in this matter. ECF No. [212] at 44. In light of her testimony that she had no knowledge of this lawsuit, along with the absence of any record evidence to suggest that Y.C. knew of or participated in this action, the Court finds the 2003 Lawsuit to be of no weight in its analysis of Y.C.'s prior litigation history.

### 3. 2004 Lawsuit

In addition, Defendant cross examined Juror Y.C. on a lawsuit filed against her on April 6, 2004, by Discover Bank to recover outstanding credit card debt. *See id.* at 45-47 ("2004 Lawsuit"). Following a Stipulation for Settlement ("Stipulation") entered into between the parties to that action and signed by Y.C. on May 19, 2004, ECF No. [188-1] at 59-60, the state court signed a Final Order of Dismissal with Prejudice and Preserving Jurisdiction to Enforce Written Stipulation for Settlement on June 3, 2004,[4] *id.* at 62-63 ("Final Order of Dismissal").

At the evidentiary hearing, Y.C. repeatedly stated that she had no recollection of ever being served with the 2004 Lawsuit or of, as Defendant suggested, going to the courthouse and entering into an agreed payment plan with Discover Bank before a judge. *See* ECF No. [212] at 45-47. Juror Y.C. acknowledged that her signature was on the Stipulation but stated that she had no recollection of this lawsuit. *Id.* at 46-47. Indeed, despite numerous questions about whether Y.C. recalled going to court and entering into the Stipulation, Juror Y.C. consistently stated that she had no memory of the 2004 Lawsuit. *Id.* at 46-47, 55-56.

Furthermore, despite Defendant's contention that Y.C. went to court, appeared before a

---

[4] This Final Order of Dismissal was docketed on June 28, 2004. *See* ECF No. [188-1] at 57.

judge, and signed the Stipulation—thus suggesting that she was aware of her involvement in other lawsuits—the Court notes that Defendant's own evidence rebuts this theory. *See* ECF No. [213] at 19 ("[I]t would defy logic to conclude that Juror Y.C. did not know she was a party to at least one prior lawsuit where she went to court, appeared in front of a judge on her own behalf and signed a Stipulation of Settlement."). Notably, the Final Order of Dismissal is dated more than two weeks after the date on which Plaintiff signed the Stipulation, and it states, "THIS CAUSE, coming on to be heard, *Ex Parte*, before me, upon the Stipulation of Settlement entered into by and between the parties in the above cause and the Court having examined the Stipulation for Settlement and attachments thereto and being fully advised in the premises . . . ." ECF No. [188-1] at 62 (emphasis added); *see also id.* at 60 (Stipulation noting that, "[u]pon signing this agreement, the Plaintiff's Counsel shall submit this agreement to the Court for ratification"). Upon review of Y.C.'s testimony and the record evidence, the Court finds no support for Defendant's argument that Y.C. knew she had been a party to other lawsuits because she actively participated in court proceedings during at least one of these prior actions. Indeed, while Juror Y.C. identified the signature on the Stipulation as hers, she also repeatedly stated that she had no recollection of the 2004 Lawsuit.

### 4.  2008 Lawsuit

Next, Defendant addressed a lawsuit filed by Arrow Financial Services LLC ("Arrow Financial") against Juror Y.C. on May 30, 2008, for unpaid credit card debt. *See* ECF No. [212] at 56-61 ("2008 Lawsuit"). Default Final Judgment was entered against Y.C. in this lawsuit on October 27, 2008. ECF No. [188-1] at 83.[5] When asked if she recalled the 2008 Lawsuit with,

---

[5] Although Defendant submitted a significant number of court records relating to the 2008 Lawsuit, the Court notes that many of these documents are dated after the trial in this case and are therefore not relevant to the Court's inquiry. *See generally id.* at 67-127. For example, Defendant emphasizes the fact that the judgment in the 2008 Lawsuit led to garnishment proceedings against Y.C. However, the writ of garnishment that was issued during the relevant time period in this case was later voluntarily dismissed

Y.C. stated that she remembered the case and testified that she was served. ECF No. [212] at 56. However, she indicated that she ignored these legal documents and took no action in response to being served with this lawsuit, and that a judgment was subsequently entered against her. *Id.* at 58-59, 61. Y.C. explained that, at some point prior to the trial in this case, she learned that a judgment had been entered against her in the 2008 Lawsuit, but she did not know the terms of that judgment. *Id.* at 59.

Upon review of the record, the Court views this line of questioning as irrelevant. The 2008 Lawsuit was never raised in Defendant's original Motion, despite Defendant's possession of such information at the time it filed the Motion. *Compare* ECF No. [141-2] (only presenting court records from six of Y.C.'s prior lawsuits, which arose in 2003, 2004, 2009, 2011, 2017, and 2018, in Defendant's appendix to the Motion),[6] *with* ECF No. [188-1] at 30 (identifying Y.C.'s 2008 Lawsuit in Defendant's Sherlock Investigations Report dated November 12, 2018). As such, Defendant's inquiry into the 2008 Lawsuit was in direct contravention of this Court's rulings regarding the scope of permissible questioning following remand—namely, that the parties were not permitted to address any new lawsuits or issues that were not originally presented in Defendant's Motion. The 2008 Lawsuit could have been timely raised in the Motion, yet Defendant chose not include any of the relevant documents with its original materials. By failing to raise a timely objection regarding the 2008 Lawsuit, Defendant waived its right to do so.

---

because the garnishee was not associated with Juror Y.C. *See id.* at 85-86, 90-91. The Court will limit its discussion to materials that were in existence at the time Y.C. was selected as a juror in this case.

[6] Curiously, in its original Motion, Defendant represented that Juror Y.C. "had been involved in *eight* civil litigation matters between 2003 and the present," ECF No. [137] at 3, yet it only submitted evidence of six prior cases in its Sealed Appendix to the Motion, *see generally* ECF No. [141-2]. *See also Torres*, 367 F. Supp. 3d at 1377 (noting that "Defendant provided court documents demonstrating that Juror YC had been sued three times by banks to recover debts, twice in foreclosure, and once by the State of Florida").

### 5.   2009 & 2011 Foreclosures

Juror Y.C. was also questioned about two prior foreclosure proceedings with which she was involved—one filed on March 12, 2009, *see* ECF No. [188-2] at 6-9 ("2009 Foreclosure"), and the other on December 15, 2011, *see id.* at 32-38 ("2011 Foreclosure").

Although Y.C. did not recall being served with the 2009 Foreclosure, she explained that, at the time of the lawsuit, she and her husband at the time were separated and "he took care of it [the foreclosure proceeding] on his own." ECF No. [212] at 71-72. On February 12, 2020, a Final Judgment of Foreclosure upon summary judgment was entered in the 2009 Foreclosure against Juror Y.C., among other individuals. ECF No. [188-2] at 14-19.

Likewise, Y.C. testified that she did not recall being involved in a subsequent foreclosure proceeding in 2011. ECF No. [212] at 73. Indeed, Y.C. stated that her ex-husband took care of the 2011 Foreclosure, as he had with the 2009 Foreclosure, and she had never received copies of the documents, including the judgment. *Id.* at 75-76. Ultimately, a Final Judgment of Foreclosure was issued in the 2011 Foreclosure on March 27, 2014. *See* ECF No. [188-4] at 4-8.

### 6.   2017 Lawsuit

Juror Y.C. was also questioned regarding an additional lawsuit against her for unpaid credit card debt, which was filed by Capital One Bank (USA), N.A. on February 2, 2017. *Id.* at 44-76 ("2017 Lawsuit").[7] Although the Return of Service notes that Y.C. was personally served with the 2017 Lawsuit on January 17, 2018, *see id.* at 59, Juror Y.C. testified that she did not recall being served with the 2017 Lawsuit and that she took no action with regard to that case. ECF No. [212] at 62-64. On February 2, 2018, a default was entered against Y.C. after she failed to appear for a pre-trial conference. ECF No. [188-4] at 61. As of the trial date in this case, there was no final

---

[7] As with the 2008 Lawsuit, the Court limits its review of the evidence submitted on the remaining two lawsuits to documents that pre-date Juror Y.C.'s jury service in this case.

disposition in the 2017 Lawsuit. *See* ECF No. [188-4] at 48-49.

### 7. 2018 Lawsuit

Finally, Defendant inquired into a lawsuit against Y.C. for unpaid credit card debt filed by Portfolio Recovery Associates, LLC on June 11, 2018. *Id.* at 78-116 ("2018 Lawsuit"). According to the Return of Service, Y.C. was personally served a few months before the trial in this case, on June 23, 2018. *Id.* at 92. However, she testified at the evidentiary hearing that, while she was aware of the lawsuit, she did not recall being served or taking any action in response to the lawsuit. ECF No. [212] at 65-66. As of the trial date in this case, there was no final disposition in the 2018 Lawsuit. *See* ECF No. [188-4] at 82-83.

### B. Juror E.S.

The inquiry of Juror E.S. followed the same procedures followed during Juror Y.C.'s questioning. Juror E.S. was placed under oath and the Court conducted an in-depth questioning on certain "core" topics, including the truthfulness of his answers to question 10 of the juror questionnaire and during the *voir dire* proceedings, his understanding of the questions posed and the meaning of the term "lawsuit," his motives for nondisclosure, his perception of the legal system as a whole, and his ability to be fair and impartial.

Defendant raises similar arguments regarding Juror E.S. as those raised about Y.C. In addition to E.S.'s alleged bias based on the number of prior lawsuits and the nature of his prior cases, Defendant argues that E.S. actively engaged and participated in litigation to such an extent that he could not credibly assert at the evidentiary hearing that he did not know what a lawsuit was. Specifically, Defendant contends that Juror E.S.'s active participation in five prior lawsuits, which concerned debt collection, foreclosure, and bankruptcy proceedings, presents clear evidence of his bias and his dishonest answers during jury selection. As with Juror Y.S., the Court will first

detail E.S.'s testimony in response to the core questions posed by the Court and counsel before turning to each of his five prior lawsuits.

### 1. Core Questions

During the evidentiary hearing, Juror E.S. testified that all of his answers on the juror questionnaire were true and that his response to question 10[8] was correct. ECF No. [212] at 112, 114; *see also id.* at 122-23 ("A. Yeah. I was truthful on all my answers on that form. . . . Q. And is it your testimony before Her Honor today that you were [] forthcoming, candid, and . . . transparent in completing that form? A. Yes."). He also stated on cross examination that he believed he had fully answered all of the questions on the questionnaire. *Id.* at 136.

Moreover, when E.S. was asked to explain why he had not disclosed any prior lawsuits in response to question 10, he responded,

> A. [] Because I don't . . . . think I had any. I don't have any.
> . . . .
> Q. Okay. So I want to make sure I understand. "No. I didn't disclose them because I didn't think I had any," meaning lawsuits, correct? That's what you said right now, right?
> A. No. No. I didn't—I answered it as no.
> Q. Right. But I want the record to be clear—
> A. The answer to that question was no.
> Q. Right. Because you didn't think you had any lawsuits, correct?
> A. Exactly.
> . . . .
> Q. . . . At the time you completed the questionnaire, you knew what a lawsuit was, correct? You just didn't—
> A. No. I didn't know a hundred percent what a lawsuit was, no.
> Q. What did you think a lawsuit was at the time you completed the questionnaire?
> A. To me, I don't know, it seemed like it would be more criminal, you know, it would be something important.
> Q. Prior to completing the questionnaire, had you been a party in lawsuits?
> A. I don't think I was, no.

---

[8] Question 10 asked "If you and/or a close family member or friend has ever been a party to a lawsuit (i.e., sued someone or been sued by someone) please describe the circumstances." Juror E.S. answered "no." *See* ECF No. [141-3]. Additionally, question 12 asked "Is there anything in your background or personal feelings which might affect your ability to be fair and impartial to both sides?" E.S. answered "no." *See id.*

*Id.* at 118-19.

Juror E.S. further explained his answer to question 10, stating that "anything that I went through with the condominium association or a credit card, it was like I know I owed the money. And when it came time to pay, I paid it. So I didn't look at it as a lawsuit." *Id.* at 136; *see also id.* at 144-45 ("Q. Now, in Question 10 . . . . [y]ou didn't describe any circumstances of a lawsuit, did you? A. I mean, I was never—it was never a lawsuit. . . . I never thought of it as a lawsuit. . . . But this case that we're on right now, yeah, that's a lawsuit. That's what I would think is a lawsuit."). Throughout the course of his testimony, E.S. reiterated this understanding on numerous occasions while discussing his prior lawsuits.[9] Juror E.S. stated that, although he did not know what a lawsuit was at the time of jury selection, he has since learned the meaning of the term. *Id.* at 200; *see also id.* at 168-69.

In addition, E.S. reiterated on cross examination that he told the truth during the *voir dire* proceedings. *Id.* at 137. Regarding the Court's question during *voir dire*,[10] E.S. reaffirmed his original answer that he was not involved in a lawsuit that had shaped his view of the legal system that would affect his ability to serve as a fair and impartial juror. *Id.* at 113. Nevertheless, E.S. testified that, when the Court posed its question during *voir dire*, he did not understand what a lawsuit was, explaining, "It just—everything I'm looking at is, you know, my condominium and

---

[9] *See, e.g.*, ECF No. [212] at 128 ("I didn't look at [the lawsuit with his condominium association] as a lawsuit. I owed them money. And the three of us—three other people on the board, we were working on the special assessments. And I—and when I had to pay it, I paid it. But I didn't realize it was a lawsuit. I never paid attention to it."); *id.* at 169 ("[W]hen I filled that out and put "no," I put no, I wasn't involved in a lawsuit. I didn't—nothing entered my mind on anything in my past. I never even thought about my past. I just felt like I never was in a lawsuit. . . . I didn't think I was in a lawsuit."); *id.* at 184-85 ("I never considered any of these things lawsuits. Because, to me, a lawsuit is—you know, it seems like it would be, you know, more than just something that somebody owes. It never—I never really thought about it.").

[10] As noted above, the Court posed the following question during *voir dire*: "Is there anyone that has been involved in a civil lawsuit that has shaped your view either negatively or positively about the legal system that you believe would have an effect on your ability to serve as a fair and impartial juror? If so, please raise your hand." ECF No. [124] at 34. No hands were raised. *See id.*

credit cards. I didn't think it was lawsuits." *Id.* at 197-98. Indeed, E.S. explained that he did not make any connection between this case and his prior lawsuits at the time of jury selection. *See id.* at 130-31, 134, 169, 184-85.

Similarly, when asked whether, after having discussed his prior cases at the evidentiary hearing, he believed he should have disclosed this litigation history in response to question 12, E.S. answered, "When I filled that out, I didn't even think of any of that. . . . I wasn't debating on what I should put down . . . . [b]ecause the answer was no. . . . It's not going to affect my ability to be [] fair and impartial [] to both sides." *Id.* at 205-06. Juror E.S. further testified that he has trust in the legal system, *id.* at 135, that he had a positive perception of the legal system, *id.* at 181, 200-01, and that his experiences in his prior lawsuits had not had significant negative effects on his life, *id.* at 159, 181, 187-89, 200-01.

### 2. 2000 Lawsuit

The first of E.S.'s five alleged prior lawsuits relates to a Rhode Island action filed by Arrow Financial that resulted in a civil judgment against E.S. for $5,423.00 on April 28, 2000. *See* ECF No. [187-1] at 86 ("2000 Lawsuit"). Similar to the inquiry of Juror Y.C., the attorneys were permitted to ask questions directly. Defendant questioned E.S. about whether the civil judgment pertained to him, as opposed to his late father, but E.S. repeatedly testified that he did not have any recollection of this lawsuit, of ever doing business with Arrow Financial, or of paying $5,423.00 to any business during April 2000. ECF No. [212] at 156. Juror E.S. acknowledged that he had previously lived at the address listed in the Sherlock Investigations Report but could not recall if he was living at that address in 2000. *Id.* at 157. Indeed, E.S. testified that he did not remember anything about Arrow Financial. *Id.* at 177.

Critically, however, the Defendant failed to submit any evidence or court records relating

to the 2000 Lawsuit to substantiate its belief that this judgment applied against Juror E.S. Rather, Defendant relied solely on a one-page excerpt from its own Sherlock Investigations Report to demonstrate E.S.'s involvement in that lawsuit. ECF No. [187-1] at 86. This unsubstantiated allegation, on its own, does not establish that E.S. participated in or knew of the 2000 Lawsuit, especially where Plaintiffs and counsel for E.S. alerted Defendant of the fact that E.S. and his late father shared the same name. The Court will not simply assume that Juror E.S. was involved in the 2000 Lawsuit in the absence of any record evidence or testimony confirming the relevance of that lawsuit to the instant proceedings. As such, the Court affords the 2000 Lawsuit no weight in its analysis of E.S.'s alleged misconduct.

### 3. 2000 Bankruptcy

Defendant questioned Juror E.S. about whether he had previously declared bankruptcy in Rhode Island. *See id.* at 81-82 ("2000 Bankruptcy"). E.S. acknowledged that he had filed for bankruptcy on one prior occasion because he could not afford to pay off his high-interest credit card debts. *See* ECF No. [212] at 152, 159, 161. E.S. also confirmed that the last four digits of his social security number matched those listed on the docket sheet that Defendant submitted on remand and agreed that this exhibit related to his bankruptcy. *Id.* at 158; *see also* ECF No. [187-1] at 81-82.[11] Juror E.S. further testified that he was represented by an attorney during his bankruptcy and that he went to court for the case on one occasion, but he did not recall speaking

---

[11] Although it referenced E.S.'s bankruptcy in passing in its initial Motion, ECF No. [137] at 3, Defendant failed to submit any evidence of the proceeding in its Sealed Appendix. On appeal, the Eleventh Circuit noted the lack of evidence pertaining to E.S.'s bankruptcy and excluded this proceeding from its analysis. *See Torres*, 979 F.3d at 879 n.2. Following the Eleventh Circuit's opinion, the only evidence that Defendant submitted relating to E.S.'s bankruptcy proceeding was an excerpt from its Sherlock Investigations Report and a printout of the bankruptcy court's docket. *See* ECF No. [187-1] at 79-82. These materials would not, ordinarily, be sufficient to establish that this bankruptcy proceeding pertained to E.S. As such, through its failure to submit any evidence of E.S.'s bankruptcy proceeding with its original Motion, Defendant seemingly waived its ability to challenge the proceeding on remand. Nevertheless, because E.S. confirmed that the docket sheet related to his bankruptcy, the Court considers this proceeding in its analysis.

to the judge during his visit. *See* ECF No. [212] at 159-60. However, when asked whether Arrow

Financial was a creditor in his bankruptcy, E.S. stated that he had no recollection of the company

or their involvement in the case. That statement was made even after he was shown a docket entry

from his case and examining the "Notice of Appearance and Request for Service of Notice by

Wendell H. Livingston for Creditor Arrow Financial Services LLC." *See id.* at 153, 156; ECF No.

[187-1] at 82. The docket sheet from his bankruptcy proceeding reflects that E.S.'s debts were

ultimately discharged on October 31, 2000. *Id.*

Juror E.S. stated that his bankruptcy and the resulting debt discharge provided him with a

sense of relief because it put an end to the frequent debt collection calls and mailings that he had

been receiving in connection with his debts. *See* ECF No. [212] at 159-61. Likewise, E.S. indicated

that, following the completion of his bankruptcy proceedings, he had a good perception of the legal

process and of dealing with the bankruptcy court. *Id.* at 162.

### 4. 2011 Foreclosure

Defendant also questioned Juror E.S. regarding a foreclosure action his condominium

association filed against him on May 16, 2011, for his failure to pay certain special assessments.

*See* ECF No. [187-2] at 21-37 ("2011 Foreclosure"). E.S. testified that he represented himself in

the 2011 Foreclosure and attended a mediation in connection with that proceeding. *See* ECF No.

[212] at 165-66; *see also* ECF No. [187-2] at 65. He also acknowledged that he had filed an answer

and a response to a motion for summary judgment in the 2011 Foreclosure, but explained that

those documents were prepared by Bernard Superstein, his neighbor who is an attorney and who

was also involved in the dispute over special assessments at the time. *See* ECF No. [212] at 166,

171-72; *see also* ECF No. [187-2] at 42-43, 76-94. As such, E.S. stated that he would sign the

documents prepared by Mr. Superstein without reading them in detail because he and Mr.

Superstein were both equally familiar with the condominium association issues surrounding the special assessments. *See* ECF No. [212] at 175-77.

On December 7, 2011, the state court granted a final judgment of foreclosure against E.S. in the amount of $20,666.83. *See* ECF No. [187-3] at 14-17. E.S. ultimately paid the final judgment amount prior to the foreclosure sale. *See id.* at 21; *see also* ECF No. [212] at 178-79. E.S. reiterated his earlier testimony that he never thought of the 2011 Foreclosure as a lawsuit because, in his view, "they were just things that I owed them. I owed them money." ECF No. [212] at 164. Moreover, Juror E.S. explained that paying this judgment of over $20,000.00 did not adversely affect him, nor did it have any significant impact on his life, because "it was something I owed them. I tried to fight it and I paid it." *Id.* at 180-81. When Defendant asked Juror E.S. about his perception of the legal proceeding, having gone from beginning to end, E.S. responded that "I never looked at it like I had to put a score to it, you know, approval rating. . . . [T]o me, it was not a big deal. It was something I owed them. It was something I paid them." *Id.* at 181.

Defendant challenges E.S.'s credibility and truthfulness by noting that, at the very least, Juror E.S. must have been aware of his prior involvement in lawsuits when he was forced to refinance his mortgage to pay off the final judgment in the 2011 Foreclosure.[12] Indeed, E.S. was asked whether he was forced to take out a mortgage on his condominium in order to satisfy any of

---

[12] Furthermore, Defendant also takes issue with E.S.'s testimony that he did not know what a lawsuit was, arguing that this testimony is neither credible nor believable because E.S. testified that he works for Mr. Superstein, who is a real estate attorney. *See* ECF No. [212] at 190-92. Defendant states that E.S. could not claim to be ignorant about the meaning of a lawsuit when he had worked for an attorney for approximately eight years and this attorney had previously filed complaints for evictions. However, Defendant misunderstands E.S.'s testimony. Indeed, while E.S. testified that he has worked for Mr. Superstein for about eight years, he specifically noted that he "do[es] rentals in [Mr. Superstein's] hotel," and that he had previously been "doing vacation rentals for him." *Id.* At no point did E.S. testify that his employment involved the legal field. E.S. further explained that Mr. Superstein had not filed any eviction actions since hiring E.S., but that, prior to hiring E.S., Mr. Superstein had apparently filed such actions. *Id.* Nothing in E.S.'s testimony about his work for Mr. Superstein suggests that he should have a deeper understanding about the meaning of a lawsuit than a layperson otherwise would.

the judgments entered against him in his prior lawsuits. *See id.* at 181, 189-90, 195-96. E.S. was forthcoming in his responses, explaining that he borrowed money from Mr. Superstein after judgment was entered against him in the 2011 Foreclosure and that loan was memorialized in a formal agreement. *Id.* at 189-90, 195-96. E.S.'s testimony was consistent with the property records Defendant submitted regarding E.S.'s condominium unit. *See* ECF No. [187-2] at 9-12 (reflecting the mortgage and corresponding promissory note between Mr. Superstein and E.S., which was dated on December 22, 2011—just over two weeks after judgment was entered in the 2011 Foreclosure).[13]

### 5. 2012 Lawsuit

Next, Juror E.S. testified about his involvement in a lawsuit filed by Equable Ascent Financial, LLC against E.S. for outstanding credit card debt on October 19, 2012. *See* ECF No. [187-3] at 27-42 ("2012 Lawsuit"). E.S. explained that the 2012 Lawsuit involved a legal dispute questioning the interest rates applied to his credit card. *See* ECF No. [212] at 186. Juror E.S. stated that he did not understood this proceeding to be a lawsuit. *Id.* Rather, he thought that he was "involved in a bank trying to get the money for the credit card." *Id.* Furthermore, E.S. acknowledged that he filed a one-page, handwritten response to the complaint, which explained that he could no longer afford his payments and he contacted the credit card company on numerous occasions to try and resolve the issue to no avail. *See* ECF No. [187-3] at 44. On June 11, 2013, final summary judgment was entered against E.S. in the amount of $18,241.43. *See id.* at 69.

When asked if he was disappointed that the credit card company was unwilling to work with him to resolve the dispute, Juror E.S. stated, "I didn't think I was going to beat it. . . . I got

---

[13] The Court also notes that E.S. entered into a Mortgage Modification Agreement on January 17, 2014, *see* ECF No. [187-2] at 14-15, but the circumstances surrounding this mortgage modification are unclear as E.S. was never questioned about this subsequent agreement. *See* ECF No. [212] at 189-90 (discussing the original mortgage and promissory note).

myself into that situation. . . . No one else put me in that situation but me." ECF No. [212] at 187.

Defendant further questioned E.S. regarding his experience during the 2012 Lawsuit:

> Q. Okay. And would you agree that you lost this lawsuit, again against a corporation, a limited liability corporation [sic]?
> A. It had nothing to do with a corporation. It was just my credit card.
> . . . .
> Q. Did you feel that you were treated unfairly?
> A. No. I know—I know that was the law—that was how they operated and that's the way it was. And I'm the one that missed the payment date. So the interest rate went up. Yeah, I tried to get it lower, but no.
> Q. Did you have to testify at some point in front of Her Honor Judge Walsh?
> A. I wasn't ordered to go there. I went there.[14]
> Q. How many times?
> A. Once. But I went there just trying to see if I can get the interest rate knocked off. That's all.
> Q. After this proceeding, what was your perception of the legal system?
> A. It didn't enter my mind, the perception of it.

*Id.* at 188-89.

### 6. 2014 Foreclosure

Juror E.S. was also questioned about a lawsuit that was filed by his condominium association on August 24, 2014, seeking to recover E.S.'s additional unpaid assessments. *See* ECF No. [187-3] at 94-103 ("2014 Foreclosure"). E.S. explained that, in this 2014 Foreclosure, he was represented by counsel because Mr. Superstein, who was also a defendant in the case, hired an attorney to represent them both. *See* ECF No. [212] at 194. Further, E.S. testified that he understood this case to be a foreclosure, but not a lawsuit, because it concerned money that he owed to his condominium association. *See id.* E.S. also stated that he attended a settlement conference in this case during which the parties reached a settlement agreement. *Id.* at 194-95.

---

[14] Confusingly, despite E.S.'s statement that he appeared in court for the motion for summary judgment hearing, it remains unclear whether E.S. participated in the hearing or presented any argument during the proceedings. *See* ECF No. [187-3] at 69 ("[This cause] having come to be heard before this Honorable Court on 06/11/2013 upon Plaintiff's Motion for Summary Judgment and the Court having heard *argument of counsel* and being otherwise fully advised in the premises, finds as follows . . . ." (emphasis added)).

Based on the parties' settlement agreement, the state court entered an order of dismissal on June 29, 2015. *See* ECF No. [187-4] at 8.

### 7.  Other Relevant Matters

Defendant also relies on a civil judgment from 1991 and two federal tax liens from 1990 and 1991, all of which allegedly concern E.S., to further bolster its arguments regarding E.S.'s dishonesty and bias. However, a review of the record evidence reveals that Defendant's reliance on the judgment and liens is tenuous at best.

Defendant first contends that E.S. was involved in a debt collection action in 1991 filed by Old Stone Bank, which resulted in a civil judgment for $2,503.00. *See* ECF No. [187-1] at 64 ("1991 Judgment"). Notably, however, as with the 2000 Lawsuit, Defendant has not presented any evidence to substantiate its belief that the 1991 Judgment was entered against Juror E.S., or that E.S. knew of this lawsuit. Rather, Defendant relies solely on an excerpt in its Sherlock Investigations Report to support the applicability of the 1991 Judgment. *Id.* Furthermore, E.S. testified that, although he previously had a savings account with Old Stone Bank, he did not recall being involved in any legal action or dispute regarding that account, nor did he recall having a judgment entered against him related to this savings account. *See* ECF No. [212] at 151-52. The Court refuses to speculate about whether the 1991 Judgment applies to E.S. absent some compelling evidence to support that theory.

Defendant's submissions on E.S.'s purported federal tax liens suffer from the same fatal flaw. In particular, Defendant relies solely upon the Sherlock Investigations Report to establish that E.S. was subject to a federal tax lien for $1,997.00 in 1990 and to another federal tax lien for $3,112.00 in 1991. *See* ECF No. [187-4] at 11-20. During the evidentiary hearing, E.S. testified that, although he could not say with certainty that these liens did not apply to him because he had

owed the IRS money in the past, he did not believe these liens applied to him. *See* ECF No. [212] at 145-51. Juror E.S. explained that he did not think that he was residing at the address listed on the liens in the early 1990s, *id.* at 148, and that the IRS had never put a lien on his property, *id.* at 146, 149. Although E.S. recalled owing the IRS approximately $3,000.00 in the past, he was unsure whether the 1991 lien at issue was in any way related to that debt because no lien had been placed on his property. *Id.* at 149. Here, as with the 1991 Judgment discussed above, Defendant has failed to provide the Court with any record evidence confirming that these liens did, in fact, apply to E.S. Likewise, E.S.'s testimony does little to substantiate Defendant's reliance on these liens, as he stated that he could not recall the period during which he resided at the address listed on the liens, but nonetheless noted that he did not believe the liens were applicable to him.

As such, the Court will not consider the 1991 Judgment or the federal tax liens in resolving Defendant's Motion, as they are not supported by any record evidence or by E.S.'s testimony.

### III. CONCLUSIONS OF LAW

Pursuant to Federal Rule of Civil Procedure 59, "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). "A motion for a new trial must be filed no later than 28 days after the entry of judgment." Fed. R. Civ. P. 59(b). Moreover, "[t]he only grounds for granting [a Rule 59] motion are newly-discovered evidence or manifest errors of law or fact." *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (quoting *In re Kellogg*, 197 F.3d 1116, 1119 (11th Cir. 1999)). As such, it is well established that Rule 59 "may not be used 'to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment.'" *Sherrod v. Palm Beach Cnty. Sch. Dist.*, 237 F. App'x 423, 425 (11th Cir. 2007) (quoting *Michael Linet, Inc. v.*

*Vill. of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005)); *see also Quainoo v. City of Huntsville*, No. 5:10-cv-00104-AKK, 2014 WL 11281203, at *2 (N.D. Ala. June 2, 2014), *aff'd*, 611 F. App'x 953 (11th Cir. 2015).

"Courts treat motions for new trial based on juror misconduct as motions for new trial based on newly discovered evidence." *New v. Darnell*, No. 1:07-cv-00162-SPM-AK, 2010 WL 1192308, at *2 (N.D. Fla. Mar. 24, 2010) (citing *United States v. McKinney*, 312 F. App'x 247, 249 (11th Cir. 2009)), *aff'd*, 409 F. App'x 281 (11th Cir. 2011). "Motions for a new trial based on newly discovered evidence are highly disfavored in the Eleventh Circuit and should be granted only with great caution." *McKinney*, 312 F. App'x at 249. The movant bears the burden of justifying a new trial. *See United States v. Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006) (footnote omitted) (quoting *United States v. Devila*, 216 F.3d 1009, 1015-16 (11th Cir. 2000)). "[G]ranting [a] motion[] for new trial touches on the trial court's traditional equity power to prevent injustice and the trial judge's duty to guard the integrity and fairness of the proceedings before [her]." *Sherrod*, 237 F. App'x at 424 (quoting *Christopher v. Florida*, 449 F.3d 1360, 1366 n.4 (11th Cir. 2006)). Ultimately, "motions for a new trial are committed to the discretion of the trial court." *Montgomery v. Noga*, 168 F.3d 1282, 1295 (11th Cir. 1999).

## A. Waiver

"A motion for a new trial based upon newly discovered evidence must not be based on evidence or incidents of which [movants] had knowledge prior to return of the jury verdict." *United States v. Calderon*, 127 F.3d 1314, 1351 (11th Cir. 1997); *see also United States v. Jones*, 597 F.2d 485, 488 n.3 (5th Cir. 1979)[15] ("[A] defendant cannot learn of juror misconduct during the trial, gamble on a favorable verdict by remaining silent, and then complain in a post-verdict motion

---

[15] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the Court of Appeals for the Fifth Circuit rendered prior to October 1, 1981.

that the verdict was prejudicially influenced by that misconduct."). "Moreover, [movants] have the burden of establishing in their motions that the evidence was in fact newly discovered and that failure to discover it prior to verdict was not due to a lack of due diligence. If [they] can not make such a showing, their motions should be denied." *Calderon*, 127 F.3d at 1351 (internal citation omitted); *see also United States v. Stacy*, 337 F. App'x 837, 839 (11th Cir. 2009).[16]

"A party waives a juror misconduct claim if the party learns of the basis for the claim during trial and fails to bring it to the court's attention before the jury renders its verdict." *New*, 2010 WL 1192308, at *2 (citing *Stacy*, 337 F. App'x at 839); *see also United States v. Edwards*, 696 F.2d 1277, 1282 (11th Cir. 1983) (explaining that the appropriate time to alert a court of an issue regarding juror misconduct would be prior to the return of the verdict because it would allow the trial court to investigate the alleged misconduct and take any suitable curative action); *Garcia v. Murphy Pac. Marine Salvaging Co.*, 476 F.2d 303, 306 n.2 (5th Cir. 1973) ("Of course, a party, with knowledge of a juror's misconduct, must make a timely objection and is not permitted to take his chances on a favorable verdict and if unfavorable get a second bite of the apple."). This rule "serves to ensure that the trial court is given every available opportunity to attempt to salvage the trial by ridding the jury of prejudicial influences," *United States v. Bolinger*, 837 F.2d 436, 439 (11th Cir. 1988), while also "prevent[ing] parties from gaming the system," *Edwards v. Hyundai Motor Mfg. Ala., LLC*, 701 F. Supp. 2d 1226, 1233 (M.D. Ala. 2010).[17] Indeed, as the Court of

---

[16] Notably, although newly discovered evidence must have been discovered after the return of the jury verdict, despite a movant's exercise of reasonable diligence, such "evidence must [nevertheless have been] in existence at the time of the trial." *N.L.R.B. v. Jacob E. Decker & Sons*, 569 F.2d 357, 364 (5th Cir. 1978). "This is so because of bedrock principles of finality and certainty of judicial proceedings." *Baucom v. Sisco Stevedoring, LLC*, No. 06-0785-WS-B, 2008 WL 2428930, at *4 (S.D. Ala. June 12, 2008).

[17] Accordingly, "a more stringent prohibition on judicial investigation [applies] *after* a verdict is rendered. Post-verdict[] inquiries must be more limited because they undermine the 'stability and finality' of verdicts." *United States v. Brown*, 996 F.3d 1171, 1209 (11th Cir. 2021) (Wilson, J., dissenting) (quoting *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 865 (2017)). "There is also less need for investigation post-

Appeals for the Fourth Circuit has stated:

> [C]ounsel [cannot] sit silently by and take chances on a favorable verdict and then complain when it turn[s] out to be unfavorable. He is not permitted thus to "speculate upon the chance of a verdict." Having been silent when it was his duty to speak, he will "not be heard to speak when it is his duty to be silent."

*Upton v. Harrison*, 68 F.2d 232, 234 (4th Cir. 1934) (citation omitted).

Additionally, a trial court's authority to grant or deny a motion for new trial based on juror misconduct furthers the strong policy interests of preserving the finality of jury verdicts and "protecting jurors from threats and needless harassment from unsuccessful parties." *United States v. Venske*, 296 F.3d 1284, 1291-92 (11th Cir. 2002); *see also McDonald v. Pless*, 238 U.S. 264, 267 (1915) (recognizing that jurors should be protected from being "harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict."). Indeed, "[t]he prevention of fishing expeditions in search of information with which to impeach jury verdicts is a principal purpose of the rule." *United States v. Davila*, 704 F.2d 749, 754 (5th Cir. 1983) (citing *United States v. Riley*, 544 F.2d 237, 241 (5th Cir. 1976)). Although stated in the context of juror misconduct for improper jury deliberations, the Eleventh Circuit previously explained the importance of protecting jurors from unnecessary scrutiny post-verdict.

> "The essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence." *Id.* Because our system of justice so prizes this unique and essential feature of our [] justice system, it both anticipates and tolerates some level of imperfection in the system. *United States v. D'Angelo*, 598 F.2d 1002, 1004-05 & n.4 (5th Cir. 1979). As the Supreme Court has explained:
>
> > There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of

verdict because concerns such as juror impartiality can be raised and investigated *before* a verdict is rendered." *Id.* (citing *Peña-Rodriguez*, 137 S. Ct. at 878 (Alito, J., dissenting); *Warger v. Shauers*, 574 U.S. 40, 51 (2014)).

Case No. 17-cv-81162-BLOOM/Reinhart

> verdicts reached after irresponsible or improper juror behavior. It is
> not at all clear, however, that the jury system could survive such
> efforts to perfect it. Allegations of juror misconduct, incompetency,
> or inattentiveness, raised for the first time days, weeks, or months
> after the verdict, seriously disrupt the finality of the process.
> Moreover, full and frank discussions in the jury room, jurors'
> willingness to return an unpopular verdict, and the community's
> trust in a system that relies on the decisions of laypeople would all
> be undermined by a barrage of postverdict scrutiny of juror conduct.

[*Tanner v. United States*, 483 U.S. 107, 120-21 (1987)] (internal citations omitted). Permission to attack jury verdicts by postverdict interrogations of jurors would allow defendants to launch inquiries into jury conduct in the hope of discovering something that might invalidate the verdicts against them. "Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict." *Id.* at 119-20 (quoting *McDonald*, 238 U.S. at 267-68). Such events would result in "the destruction of all frankness and freedom of discussion" in the jury room. *Id.* And, as early as 1892, the [United States] Supreme Court expressed concern that such postverdict investigation would "induce tampering with individual jurors subsequent to the verdict." *Mattox v. United States*, 146 U.S. 140, 149 (1892). In a justice system that depends upon public confidence in the jury's verdict, such events are unacceptable.

*United States v. Siegelman*, 640 F.3d 1159, 1185-86 (11th Cir. 2011) (footnote omitted).

## 1. Defendant's Post-Trial Motion

As noted above, Defendant filed the instant Motion seeking a new trial following its post-verdict juror investigation, which revealed that Jurors Y.C. and E.S. had failed to disclose their prior litigation history during jury selection. Plaintiffs responded that Defendant had waived its right to challenge any juror nondisclosure by failing to exercise reasonable diligence in conducting its investigation into the jurors' backgrounds. Specifically, Plaintiffs argued that, because the parties were given the names and identifying information of each juror prior to the start of trial, and because the allegedly newly discovered evidence was widely available through public records searches, Defendant had an obligation to investigate and raise any issues regarding juror misconduct prior to the jury's verdict. As Defendant waited until after the jury rendered its verdict to commence its investigation, Plaintiffs argue that any challenges arising out of that untimely

investigation are waived. Moreover, in its Order, this Court declined to address whether Defendant had waived its claims of juror misconduct because the Court concluded that, regardless of waiver, the Motion failed on the merits. *See Torres*, 367 F. Supp. 3d at 1379 n.4. However, upon remand from the Eleventh Circuit, the Court addresses waiver to provide a more comprehensive review of the issues raised in Defendant's Motion.

Upon review of the parties' briefs and the record in this case, the Court concludes that Defendant waived its right to challenge the juror nondisclosure by failing to demonstrate that it acted with due diligence in pursuing its investigation. *See Calderon*, 127 F.3d at 1351 (on a motion for new trial based on newly discovered evidence, movants bear "the burden of establishing in their motions that the evidence was in fact newly discovered and that failure to discover it prior to verdict was not due to a lack of due diligence" (citing *Jones*, 597 F.2d at 489)). Indeed, the parties in this case were provided with the juror questionnaires before trial, and these questionnaires included each juror's information. Both parties were given the opportunity to ask questions of each juror on *voir dire*. Defendant was also well aware of the amount of damages at issue at trial. As such, Defendant possessed all of the necessary information to conduct its investigation prior to the return of the verdict but failed to do so.[18]

The timeline of events leading up to Defendant's Motion, and Defendant's own representations in the briefing, are fatal to the issue of waiver. Notably, in an attempt to refute

---

[18] Courts are "always reluctant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences." *Morales v. Merco Grp.*, No. 09-22554-CIV, 2011 WL 3666605, at *3 n.1 (S.D. Fla. Aug. 22, 2011) (quoting *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) (internal quotations omitted)). "[P]ost-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts." *Id.* (quoting *Ianniello*, 866 F.2d at 543). As such, courts have "consistently refused to allow a defendant to investigate 'jurors merely to conduct a fishing expedition.'" *Ianniello*, 866 F.2d at 543 (quoting *United States v. Moten*, 582 F.2d 654, 667 (2d Cir. 1978)); *see also Davila*, 704 F.2d at 754.

Plaintiffs' arguments regarding waiver, Defendant submitted the Declaration of Benjamin M. Esco, who was lead counsel for Defendant at trial in this case. *See* ECF No. [152-1] ("Esco Declaration"). Mr. Esco states that he has served as lead counsel in approximately 80-100 civil jury trials in both state and federal courts. *Id.* ¶ 3. The Esco Declaration goes on to explain that:

> 5. The Torres trial resulted in the largest money judgment that has ever been entered against any defendant(s) whom I have previously represented at trial.
> 6. I have never previously in my career conducted or requested post-trial proceedings to question the veracity of any juror or their individual input into a trial verdict.
> 7. Based on the verdict's size in the Torres trial, including the award for past medical expenses, First Transit retained a private investigative firm to examine the jurors' backgrounds on November 9, 2018, one day after the verdict. The report was received on November 12, 2018.[19]

*Id.* ¶¶ 5-7.

Thus, Mr. Esco's Declaration makes it abundantly clear that Defendant only sought to investigate the jurors after it received an unsatisfactory verdict at trial. Critically, it was the *size* of the verdict, rather than some well-founded suspicion of juror misconduct, that caused Defendant to inquire into the jurors' backgrounds. This is precisely the type of gamesmanship that courts often caution against when discussing the importance of preserving the finality of verdicts and of protecting jurors from harassment by unhappy litigants. *See Tanner*, 483 U.S. at 119-21; *see also McDonald*, 238 U.S. at 267-68. As discussed above, the law in this Circuit is clear—a litigant cannot gamble on the likelihood of a favorable verdict and then challenge that verdict post-trial if unsuccessful. *See Jones*, 597 F.2d at 488 n.3 ("[A] defendant cannot learn of juror misconduct during the trial, gamble on a favorable verdict by remaining silent, and then complain in a post-

---

[19] As noted above, the jury returned its verdict on November 8, 2018, *see* ECF No. [109], and the Court entered Final Judgment on November 13, 2018, ECF No. [110]. Then, on December 11, 2018, Defendant filed its Motion seeking a new trial for juror misconduct. ECF No. [137].

verdict motion that the verdict was prejudicially influenced by that misconduct.").[20] Indeed, "[p]arties cannot put the courts in 'gotcha' positions by their lack of due diligence." *United States v. Feldman*, No. 11-CR-20279, 2016 WL 8505087, at *1 (S.D. Fla. Feb. 18, 2016).

On a motion for new trial based on newly discovered evidence, the movant bears the burden of establishing that the evidence is, in fact, newly discovered. *See Calderon*, 127 F.3d at 1351 (citing *Jones*, 597 F.2d at 489). "Newly discovered evidence is evidence that could not have been discovered with due diligence at the time of trial." *United States v. Beasley*, 582 F.2d 337, 339 (5th Cir. 1978). "There is no bright-line rule for determining whether a defendant exercised due diligence to uncover new evidence." *Feldman*, 2016 WL 8505087, at *2. Nevertheless, where a litigant fails to diligently investigate their claims and raise them in a timely manner, such claims are deemed to be waived. *See, e.g.*, *Bolinger*, 837 F.2d at 438-39; *Jones*, 597 F.2d at 488 n.3; *Edwards*, 696 F.2d at 1282; *New*, 2010 WL 1192308, at *2; *Williams v. Marriott Corp.*, 864 F. Supp. 1168, 1173 (M.D. Fla. 1994).

Tellingly, Defendant makes no attempt to satisfy this burden in its Motion. Instead, Defendant simply states that it was entitled to rely on the juror questionnaires without conducting additional inquiries into the jurors' backgrounds prior to the return of the verdict and that, following the return of the jury verdict, Defendant immediately began pursuing its claims. Likewise, at the evidentiary hearing, Mr. Esco gave the following explanation for why he did not conduct a public records search prior to the return of the verdict:

> I don't have a laptop. I don't do that. I don't—I'm not technologically oriented. But after this trial, my—Judge, my client did the background check, and I filed them, of 20-something pages or so on each juror that was done, and that's what gave us the information for the motion for new trial. That comprehensive document that

---

[20] *See also Garcia*, 476 F.2d at 306 n.2 (explaining that a litigant cannot take his chances on a favorable verdict and then, if unsuccessful, take a second bite of the apple through post-trial juror misconduct claims); *Upton*, 68 F.2d at 234 (same); *Edwards*, 701 F. Supp. 2d at 1233 (stating that the rules on newly discovered evidence and waiver prevent the parties from trying to game the system).

was done by professional investigators[.]

ECF No. [212] at 225.

These arguments are all due to be rejected. While it may be true that Defendant had no obligation to conduct additional investigations into the jurors to verify their questionnaire answers, this statement does not relieve Defendant of its burden in moving for a new trial.[21] "In order to obtain a new trial based on newly discovered evidence, [Defendant] must establish that the evidence was discovered after trial and that the failure to discover the evidence prior to the jury verdict was not due to a lack of due diligence." *Stacy*, 337 F. App'x at 839 (citing *Calderon*, 127 F.3d at 1351). Yet, here, despite acknowledging that the evidence of Y.C. and E.S.'s litigation history was available through public records, *see* ECF No. [152] at 5-7, Defendant fails to provide *any* explanation for why this evidence could not have been obtained prior to the return of the verdict. Rather, the widespread availability of these public records suggests that Defendant did not act diligently in raising these juror misconduct issues after trial. *See, e.g.*, *United States v. Burke*, 724 F. App'x 837, 840-41 (11th Cir. 2018) (noting that the movants had not acted diligently where the materials attached to the motion for new trial were predominantly public records published prior to trial); *United States v. Cook*, 170 F. App'x 639, 640 (11th Cir. 2006) (affirming denial of new trial motion where defendant "has not shown that he could not have possessed [the] evidence with reasonable diligence," and the new evidence was publicly available); *United States v. Vallejo*, 297 F.3d 1154, 1164 (11th Cir. 2002) (affirming denial of new trial motion where allegedly withheld public record information could have been obtained through due diligence); *United States*

---

[21] Likewise, with regard to Mr. Esco's statement that he does not have a laptop and he therefore could not perform the public records search, the Court reiterates that Defendant, as the movant, is required to satisfy a high burden in order to establish its entitlement to a new trial in this case. *See United States v. Spellissy*, 346 F. App'x 446, 451 (11th Cir. 2009) ("Indeed, Defendant faces a 'high burden in demonstrating that a new trial is warranted.'" (quoting *Campa*, 459 F.3d at 1151)). This burden is a necessary prerequisite to obtaining relief on the instant Motion that is unaffected by counsel's technological capabilities.

*v. Slocum*, 708 F.2d 587, 600 (11th Cir. 1983) (concluding that the defendant had not demonstrated due diligence prior to uncovering the "newly discovered" evidence); *Feldman*, 2016 WL 8505087, at *2 (concluding that the defendant had not been diligent where he had ample time to obtain the "new" evidence and where this evidence was publicly available to the defendant at all times).

Upon review of the record, the Court fails to see how Defendant's post-trial conduct could be anything other than an improper attempt to get a second bite of the apple following an unfavorable jury verdict. Litigants cannot be permitted to circumvent the overarching principles regarding the sanctity and finality of jury verdicts based solely on their dissatisfaction with the result at trial. Indeed, courts have condemned litigants' participation in "planned, systematic, broad-scale posttrial inquisition[s] of the jurors," and have found such efforts to be "reprehensible." *See Ianniello*, 866 F.2d at 544-45 (quoting *United States v. Brasco*, 516 F.2d 816, 819 n.4 (2d Cir. 1975)). In light of the clear and explicit guidance from the Supreme Court regarding the balance of interests in post-verdict proceedings, it would be untenable to conclude that Defendant has not waived its juror misconduct challenges, which were only raised because Defendant was dissatisfied with the size of the jury verdict. Accordingly, the Court finds that Defendant waived the instant challenges to Y.C. and E.S.'s litigation history, and the jury's verdict and resulting judgment, because Defendant failed to diligently investigate and present these claims to the Court prior to the return of the verdict.[22]

### 2.  Proceedings on Remand

As discussed above, following remand from the Eleventh Circuit, this Court held a status conference to discuss the relevant procedures for the evidentiary hearing. *See* ECF No. [184]. During this status conference, Defendant sought leave to supplement the record with additional

---

[22] In the interests of completeness, the Court will nevertheless address the substantive issues raised in the Motion below.

documents regarding Y.C.'s and E.S.'s litigation history that were obtained during a supplemental investigation into these jurors in preparation for the evidentiary hearing. However, the Court cautioned the parties that the scope of the evidentiary hearing would be limited to those legal proceedings that were originally raised in Defendant's Motion. *Id.* at 10-14. Moreover, pursuant to this Court's order, Defendant timely filed the supplemental evidence for the Court to review. *See* ECF Nos. [187] & [188].

On February 12, 2021, the Court held another status conference to discuss the relevance of these supplemental documents, among other things. *See* ECF No. [200]. The Court reiterated that the scope of the evidentiary hearing would be limited to those civil lawsuits that were originally cited in Defendant's Motion and noted that many of the records and documents Defendant submitted were not relevant to the Court's inquiry because they had not been presented with the initial Motion. *Id.* at 10-15. These additional documents included, among others, a felony conviction allegedly against E.S. from 1985, *see* ECF No. [187-1] at 43-60, and a debt collection lawsuit allegedly filed against Y.C. in 2019—after the conclusion of the trial in this case, *see* ECF No. [188-5] at 2-86. These supplemental records were beyond the scope of Defendant's original Motion, this Court's Order, and the appeal to the Eleventh Circuit, and were therefore not allowed to be introduced during the evidentiary hearing. Nevertheless, Defendant repeatedly renewed its request to question the jurors about these additional lawsuits, which the Court denied. *See, e.g.*, ECF Nos. [196] & [202]; ECF No. [212] at 6-13, 107-08.

"The question [of] whether to reopen the record on remand is 'left to the sound discretion of the trial court.'" *Cambridge Univ. Press v. Albert*, 906 F.3d 1290, 1302 (11th Cir. 2018) (quoting *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 551 (1983)). Pursuant to that discretionary authority, the Court concluded that it would be inappropriate to admit new evidence

of additional legal proceedings against Y.C. and E.S., "offered years after the close of the trial and entry of the judgment and after review by the Court of Appeals." *Id.* Although Defendant still contends that it should have been permitted to introduce this evidence at the evidentiary hearing and to question the jurors on these additional materials, Defendant has not provided the Court with any compelling reason to reopen the record in this case to introduce additional evidence three years later, nor has the Court found any. *See Berenguela-Alvarado v. Castanos*, 820 F. App'x 870, 874 (11th Cir. 2020) (concluding that district court acted well within its sound discretion in denying a request to reopen the record where the movant had ample opportunity to present the "new" evidence during the original proceedings).

Additionally, regarding the 1985 felony conviction allegedly against E.S., the Court concludes that Defendant waived its opportunity to challenge this conviction, as the conviction could have been presented in the original Motion had Defendant exercised due diligence. *See id.*; *see also Cambridge Univ. Press*, 906 F.3d at 1302 (explaining that the movants were or should have been aware that this "new" evidence was relevant at the time of the original proceedings). Likewise, regarding legal proceedings that arose after Y.C.'s jury service in this case, this evidence is entirely irrelevant to her mental impressions and motives in answering the jury selection questions *at the time of trial*. *See Jacob E. Decker & Sons*, 569 F.2d at 364 (stating that newly discovered evidence discovered after trial must nonetheless have been in existence at the time of the trial). Therefore, Defendant waived the right to raise any alleged claims of juror misconduct against Y.C. and E.S.'s regarding this supplemental evidence.

## B.  Juror Misconduct

The Supreme Court has long held that a litigant "'is entitled to a fair trial but not a perfect one,' for there are no perfect trials." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548,

553 (1984) (quoting *Brown v. United States*, 411 U.S. 223, 231-32 (1973)). "Trials are costly, not only for the parties, but also for the jurors performing their civic duty and for society which pays the judges and support personnel who manage the trials." *Id.* Moreover, the Supreme Court has stated that one touchstone of a fair trial is an impartial trier of fact, i.e., "a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). "*Voir dire* examination serves to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors," and "[t]he necessity of truthful answers by prospective jurors . . . is obvious." *McDonough Power Equip., Inc.*, 464 U.S. at 554.

As such, the Supreme Court has enunciated the applicable standard for determining when juror responses during *voir dire* warrant a new trial: (1) "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*," and (2) they must "further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556.[23] While "[t]he motives for concealing information may vary, [] only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *Id.*

"The first prong of the *McDonough* test requires a determination of whether the juror's answers were honest, 'that is, whether he was aware of the fact that his answers were false.'" *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1473 (11th Cir. 1992) (quoting *United States v. Perkins*, 748 F.2d 1519, 1531 (11th Cir. 1984)). Stated differently, this prong hinges on the intentional dishonesty of a juror's response, rather than on a "mistaken, though honest, response to a question." *United States v. Carpa*, 271 F.3d 962, 966 (11th Cir. 2001). "Often, the juror's dishonesty in and of itself is 'a strong indication' that she was not impartial." *McWhorter v. Comm'r, Ala. Dep't of Corr.*, 824 F. App'x 773, 782 (11th Cir. 2020) (citing

---

[23] This standard has been applied to allegations of juror misconduct in both civil and criminal cases. *See United States v. O'Neill*, 767 F.2d 780, 785 (11th Cir. 1985).

*Perkins*, 748 F.2d at 1532).

Additionally, the second prong of the *McDonough* test "requires a showing of actual bias." *BankAtlantic*, 955 F.2d at 1473 (citing *Perkins*, 748 F.2d at 1532; *United States v. Casamayor*, 837 F.2d 1509, 1515 (11th Cir. 1988)). "Actual bias may be shown in two ways: 'by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed.'" *Perkins*, 748 F.2d at 1532 (quoting *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976)). Presumed bias, which is a fact specific, exists where "the circumstances point so sharply to bias in a particular juror that even his own denials must be discounted in ruling on a challenge for cause." *Nell*, 526 F.2d at 1229 & n.8.

Defendant argues that a new trial is warranted because Juror Y.C. and Juror E.S. each failed to disclose his/her significant litigation history during jury selection. Specifically, Defendant notes that, before being selected to serve on the jury in this case, Y.C. was a named party in seven prior lawsuits involving debt collections actions and foreclosures, and E.S. was a named party in five separate lawsuits relating to debt collections actions, foreclosures, and a personal bankruptcy. Defendant argues that both jurors intentionally and dishonestly concealed this information during jury selection. Defendant further contends that neither Y.C. nor E.S. could fairly and impartially serve as jurors because this case involved significant collections issues relating to Plaintiffs' hospital bills. Rather, Defendant states that bias must be presumed based on Y.C. and E.S.'s extensive litigation histories, which involved some type of debt. Defendant therefore requests a new trial. Plaintiffs take the contrary position, arguing that both jurors adequately explained their mistaken, but honest understanding of the questions posed to them during jury selection and there was no evidence of bias on either juror's part. The Court will address each prong of the *McDonough* test below.

### 1. Dishonesty

As discussed above, the first prong of the *McDonough* test "requires a determination of whether the juror's answers were honest." *Carpa*, 271 F.3d at 967 (citing *BankAtlantic*, 955 F.2d at 1473). "[T]he honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial." *Perkins*, 748 F.2d at 1532.

Regarding Juror Y.C., the Court concludes that she gave honest answers during jury selection. Indeed, having had the opportunity to speak directly with Y.C. and to closely observe her demeanor throughout her testimony, the Court finds that her explanations regarding the truthfulness of her answers and her understanding of the term "lawsuit" were credible. The Court also concludes that her mistaken understanding of what was encompassed within the term "lawsuit" was reasonable. *See McDonough Power Equip., Inc.*, 464 U.S. at 555 ("The varied responses to [] question[s] on *voir dire* testify to the fact that jurors are not necessarily experts in English usage. Called as they are from all walks of life, many may be uncertain as to the meaning of terms which are relatively easily understood by lawyers and judges."). Indeed, it was apparent from her testimony that Y.C. provided what she understood to be honest, albeit inaccurate, answers to the questions posed during jury selection based on her understanding at that time. *Cf. Perkins*, 748 F.2d at 1532 (concluding that the juror was dishonest where his conduct went beyond mere nondisclosure, and involved his concealment of the fact that he knew the defendant, his past involvement in similar, lengthy litigation, and his inconsistent recollections of relevant facts).

At the evidentiary hearing, Y.S. acknowledged that she had made a mistake in her answers during jury selection but stated that the error was unintentional and was based on her understanding that a lawsuit "involved someone getting hurt." ("I thought lawsuits were only cases where— where people were seeking compensation for pain and suffering, and – like in a car accident or an

accident at work, someone getting hurt."). *See* ECF No. [212] at 90, 22. She was credible and the Court credits her responses as earnest and truthful. It is also worth noting that neither the record nor Y.C.'s testimony reveals any nefarious or improper motive for the nondisclosure. In the absence of any evidence demonstrating that Juror Y.C. purposefully withheld information about her prior litigation history, the Court concludes that her answers during jury selection were not intentionally dishonest. *See United States v. Quilca-Carpio*, 118 F.3d 719, 722 (11th Cir. 1997) (affirming denial of motion for new trial, and agreeing with the district court that it would be speculative to assume the juror's responses to *voir dire* were dishonest based solely on his nondisclosure).

Next, regarding E.S., the Court also finds that his responses during jury selection were truthful, given his understanding of what a lawsuit was at the time. As with Juror Y.C., the Court spoke at length with E.S. during the evidentiary hearing and observed his general demeanor and manner of responding to the questions posed. Based on these observations, his testimony, and the evidence in the record, the Court finds Juror E.S. to be credible. In particular, E.S. explained that at no point during jury selection did he make any connection between his prior litigation history and the instant case. *See* ECF No. [212] at 130-01, 134, 169, 184-85. In fact, E.S. consistently testified that he did not believe that his prior cases were lawsuits because they all involved sums of money that he owed and ultimately paid. *See id.* at 128, 136, 144-45, 169, 184-85. He explained that he believed a lawsuit "would be more criminal, you know, it would be something important." *Id.* at 118-19. Likewise, the Court is satisfied that E.S.'s incorrect answers during jury selection were reasonably based upon his misunderstanding of what constituted a lawsuit. *See New v. Darnell*, 409 F. App'x 281, 283 (11th Cir. 2011) (finding that juror "could have reasonably concluded that he was not covered by the [] questions," and that "the district court could have

reasonably concluded that [his] answers were true or that any failure to disclose additional information was inadvertent"). Accordingly, E.S.'s testimony and general demeanor during the evidentiary hearing, coupled with the explanations he provided for why he failed to disclose his prior litigation history, support the Court's conclusion that "these were most likely innocent omissions, due to not remembering or not understanding the full scope of the question, rather than some nefarious attempt to gain the trust of [Defendant's] counsel so he would be chosen for the jury [despite] to his bias[.]" *Suppa v. Costa Crociere, S.p.A.*, No. 07-60526-CIV, 2008 WL 3926446, at *4 (S.D. Fla. Aug. 26, 2008).

In sum, the Court finds that neither juror was intentionally dishonest in their answers on the questionnaire or during *voir dire*. Because Defendant failed to satisfy the first prong of the *McDonough* test, the Court does not need to address the issue of actual bias. Nevertheless, as discussed below, Defendant has also failed to establish actual bias related to either Y.C. or E.S.

### 2. Actual Bias

Upon satisfying the dishonesty prong of the *McDonough* test, "there must [then] be a showing of bias that would disqualify the juror." *Carpa*, 271 F.3d at 967 (citing *BankAtlantic*, 955 F.2d at 1473); *see also McDonough Power Equip., Inc.*, 464 U.S. at 556 (explaining that the second prong requires a showing that a "correct response would have provided a valid basis for a challenge for cause"). "Bias may be shown either by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed." *Carpa*, 271 F.3d at 967 (citing *BankAtlantic*, 955 F.2d at 1473).[24]

---

[24] The Eleventh Circuit recently reiterated a movant's burden when attempting to show actual bias:

> To exclude a prospective juror for cause, a party must demonstrate that the juror in question exhibited "actual bias" by showing either an "express admission of bias or facts demonstrating such a close connection to the present case that bias must be presumed." *United States v. Chandler*, 996 F.2d 1073, 1102 (11th Cir. 1993) (citing *United States v.*

As an initial matter, the Court notes that neither Y.C. nor E.S. has made any sort of express admission of bias in this case. Rather, Defendant contends that the Court must presume Y.C.'s and E.S.'s bias from their dishonest answers during jury selection and from their extensive histories of collections actions. Upon review, however, the Court concludes that Defendant has not established that Y.C. or E.S. was biased.

First, as discussed in the preceding section, the Court has concluded that neither juror was dishonest in their answers during jury selection. Rather, Y.C. and E.S. presented credible and compelling testimony explaining that their answers were founded upon their mistaken but honest understanding of the questions posed. Further, the Eleventh Circuit has stated that "the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial," *Perkins*, 748 F.2d at 1532, and these jurors' honesty during jury selection weighs heavily against Defendant's argument regarding actual bias.

Additionally, contrary to Defendant's argument, Y.C. and E.S.'s prior collections actions and overall litigation history were not so closely connected to the circumstances of this case such that bias must be presumed. Notably, during the evidentiary hearing, both jurors explicitly denied making any connection between this case, including any potential collections issues relating to this case, and their own prior litigation history. Defendant has not submitted any evidence that would call the jurors' statements into question on this point.

Assuming for the sake of analysis that [Defendant has] satisfactorily demonstrated

---

*Khoury*, 901 F.2d 948, 955, *modified*, 910 F.2d 713 (11th Cir. 1990)). The burden is on the challenger to show that the prospective juror was actually biased, having a "preconceived notion as to the guilt or innocence of an accused" of such "nature and strength" that "the juror [could not] lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961). Whether an individual juror is biased is a question of fact. *Patton v. Yount*, 467 U.S. 1025, 1036-37 (1984).

*Teasley v. Warden, Macon State Prison*, 978 F.3d 1349, 1356 (11th Cir. 2020).

that the two jurors did not provide accurate and honest answers during voir dire, [Defendant has] still failed to demonstrate the jurors' actual bias. [Defendant has] not identified any express admissions by the two jurors of bias against people similarly situated to [Defendant]. And the jurors' allegedly undisclosed bankruptcies, foreclosures, and [] mortgage transactions, if true, would not demonstrate such a close connection to the [personal injury issues] of this case that bias could be presumed. In short, [Defendant has] not proven that the Court should have struck the two jurors for cause; therefore, [Defendant is] not entitled to a new trial on the basis of juror misconduct.

*United States v. Burke*, No. 13-CR-20616, 2016 WL 7665899, at *3 (S.D. Fla. Oct. 4, 2016), *aff'd*, 724 F. App'x 837 (11th Cir. 2018); *see also BankAtlantic*, 955 F.2d at 1473 (concluding that the jurors were neither biased nor closely connected to the case or to either party where the movant provided no specific facts that would create a presumption of bias and no evidence that the jurors felt compelled to misrepresent themselves, that they knew either party, that they were ever involved in similar litigation, or that they had a motive to conceal information just to get on the jury and find against the movant). Likewise, both Y.C. and E.S. testified that they harbored no biases for or against either party in this case in connection with their past lawsuits, and explained that they have positive perceptions of the legal system and were able to be fair and impartial jurors during the trial in this case.

In its Order Denying the Defendant's Motion for New Trial and for Remittitur, the Court assumed that the Jurors' answers on the juror questionnaire were dishonest, in order to further analyze the second prong of bias, ultimately concluding that bias was not demonstrated. *See* ECF No. [155] at 5-6. Upon remand, and with the benefit of a full evidentiary hearing, a wholesome record, and credibility determinations, the Court concludes that Defendant has failed to demonstrate actual bias on the part of Y.C. or E.S., nor has it successfully presented any specific facts showing such a close connection to the litigation at hand such that bias must be presumed. Having failed to satisfy either prong of the *McDonough* test, the Court concludes that Defendant's Motion must be denied.

Case No. 17-cv-81162-BLOOM/Reinhart

## IV.  CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendant First Transit, Inc.'s Motion for New Trial and Remittitur, **ECF No. [137]**, is **DENIED**.[25]

**DONE AND ORDERED** in Chambers at Miami, Florida, on August 3, 2021.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

---

[25] Although the Eleventh Circuit vacated this Court's Order and remanded the case for an evidentiary hearing, the Court notes that it analyzed the alternative request for remittitur and denied relief on that basis as well. *See Torres*, 367 F. Supp. 3d at 1380-82. As such, to the extent that the Order was vacated in its entirety, the Court readopts and incorporates its reasoning on the remittitur issue here.